THE INTER-STATE GALLOWAY CATTLE COMPANY V.
J. K. McLAIN.

1. CATTLE COMPANY — *Chattel Mortgage, Embracing Whole Herd* — *Separation, Unnecessary.* A cattle company had a herd of 361 steers together, and sold M. 250 of the average of the herd, but no selection or separation was made, and M., to secure the payment of the purchase-price, mortgaged them back to the seller, describing them by marks and brands. About four months afterward, and before any rights of others had intervened, the cattle company sold the remainder of the herd to M. and took a mortgage on them to secure the purchase-price of the same, in which the cattle were described by the marks and brands which they bore. The mortgages were intended to cover the entire number purchased, each upon its face was valid, and both were filed in the county where M. resided. The cattle so purchased and mortgaged were all that M. owned or had in his possession. In a controversy between the cattle company and a third party, who claims to have acquired an interest in the cattle after the mortgages were executed and filed and while they were in force, it is *held*, that the fact that there was no separation of the 250 steers from the rest of the herd when the first purchase and mortgage were made does not under the circumstances render the mortgages void; that the subsequent purchasing and mortgaging of all the cattle made a separation unnecessary; and that any defect in the first mortgage for lack of such separation was cured by the subsequent action of the parties, which removed all doubt as to the identity of the property sold and mortgaged.

2. EVIDENCE — *Jury.* The testimony examined, and *held* to be such that it should have been submitted to the jury for its consideration.

*Error from Wyandotte District Court.*

ACTION of replevin, brought by the *Inter-State Galloway Cattle Company* against *J. K. McLain,* to recover the possession of 347 steers. On November 9, 1885, the cattle company was the owner of 361 steers, which were being held together in Edwards county, and the company tried to sell the whole lot to Samuel Martin, of Lincoln county. He was unwilling to buy all, but purchased 250 of the number, and it was arranged between the parties that the remaining 111 head should be driven to Lincoln county and kept with those pur-

chased by Martin. The following is the receipt then executed by Martin:

"KINSLEY, KANSAS, Nov. 9, 1885.—Received of the Inter-State Galloway Cattle Company 111 head of Arizona steers, 3, 4 and 5 years old; these steers are an average lot of 361 head which I this day start to Lincoln county, Kansas; 250 of the average of said 361 head I have purchased; and I hereby agree to keep them until called for within 30 days, with my 250 head, and receive for payment for the keeping of the same an average price of the cost per head of the entire lot.                     SAMUEL MARTIN."

At the same time Martin, who had not paid for the steers, executed a note to the company for $10,625, and also a chattel mortgage on the steers purchased to secure the payment of the indebtedness. The steers are described in the mortgage as follows: "250 Arizona steers, 3, 4, and 5 years old, branded 'T & W' on the left hip, and also various other marks and brands, this being the same lot of cattle purchased by the first party of the Inter-State Galloway Cattle Company." This mortgage was duly filed in the office of the register of deeds of Lincoln county, on November 21, 1885. In accordance with the arrangement, the cattle were driven by Martin to Lincoln county. In March, 1886, the cattle company sold the remaining part of the herd to Martin, being 109 head, two of the cattle having strayed away while being driven from Kinsley to Lincoln county. For these Martin executed a note for $4,251, due in one year after date, and at the same time executed a chattel mortgage to secure its payment upon the steers sold. The note and mortgage were dated November 9, 1885, the same day upon which the 250 steers were sold. This was done upon agreement of the parties in order to cover the cost of feeding the 109 head from November 9 until the time of the second sale. They were described in the mortgage as follows: "109 Arizona steers, 3, 4, and 5 years old, branded 'T & W' on the left hip, also various other marks and brands, this being the same lot of cattle purchased by the said first party of the said Inter-State Galloway Cattle Company." This mortgage was filed in the office of

the register of deeds of Lincoln county, on August 12, 1886. In October, 1886, the cattle were moved from Lincoln county to Jewell county, for the alleged purpose of feeding them there. The general manager of the cattle company learning this fact, thought it was necessary that a notice of the mortgage should be on file in Jewell county, and obtained from Martin a chattel mortgage on the whole herd of cattle, which had then been reduced to 347 head, in which they were described as in the former mortgages, and it was there stated that it was "the intention of this mortgage to convey to the Inter-State Galloway Cattle Company the lot of cattle purchased by the said Martin of said Inter-State Galloway Cattle Company November 9, 1885." This mortgage was filed in the office of the register of deeds of Jewell county, on October 21, 1886. Indorsed on the mortgage was the affidavit of Martin that he was the lawful owner of the property described therein. The cattle were held and being fed upon the farm of one Charles H. King, in Jewell county, and in the latter part of October it is alleged that King negotiated a loan of from $8,000 to $10,000 of the defendant McLain, and on November 1 it is claimed that defendant made a loan to King, taking a mortgage from King on these cattle. Early in December, 1886, the cattle company, becoming suspicious, employed a man to watch the cattle and see that they were not removed. About December 20 the defendant went from Kansas City to Jewell county, took the cattle from the premises of King and drove them rapidly to Hardy, Nebraska, where they were loaded on the cars in the night-time, and shipped through on a special and speedy run over the Burlington & Missouri River railroad to Kansas City. The cattle company learning of this fact, pursued the cattle and found them at the Kansas City stock-yards, on the Kansas side, and immediately took steps to obtain possession of them. They were then driven on the Missouri side, where they were followed, but before the plaintiff could get service of replevin papers they were driven back to the Kansas side, where this proceeding was instituted and the service of the writ made. Defendant

gave a redelivery bond, and retained possession of the cattle. At the October term, 1887, when the cause came on for trial, these and other facts were offered in testimony, when the defendant demurred to the evidence on the ground that it did not show facts sufficient to constitute a cause of action. The demurrer was sustained, and judgment given in favor of the defendant. The plaintiff excepts, and brings the case here.

*Gardiner Lathrop*, and *Charles W. Clarke*, for plaintiff in error.

*J. H. Mechem*, for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J.: The testimony held by the court to be insufficient to send the case to the jury showed that the 250 steers sold to Martin on November 9, 1885, and the 109 steers sold in the following March, were undoubtedly the property of the Inter-State Galloway Cattle Company at the times of sale. It further disclosed that the company had never received payment for the cattle sold. When the first lot of 250 steers was sold, Martin executed a mortgage on them to secure the payment of the purchase-money, in which the cattle were described by marks and brands, and all must concede that the mortgage on its face was valid. When a sale of the remainder of the herd was made, in March, 1886, a mortgage was made to secure the payment of the purchase-money, and the cattle were then properly described by marks and brands, and that mortgage appears on its face to be valid. The two mortgages covered all the cattle sold by the plaintiff to Martin, and so far as the testimony shows, all the cattle which Martin owned or had in his possession. The mortgages were taken in good faith to secure the payment of the purchase-money, which has never been paid, and the mortgages have never been assigned, canceled or satisfied by the plaintiff. On November 1, 1886, when the defendant claims to have acquired an interest in the cattle, the plaintiff's mortgages were on file in the office of the register of deeds, in Lincoln county, where Martin resided,

and anyone examining the records would have discovered that the mortgages were then in force and apparently valid.

The nature of King's interest in the property is not clearly shown. Martin claimed that he drove the cattle to Jewell county to be fed, and it seems that some of his employés continued to care for the cattle after their removal to King's ranch. There is testimony tending to show that King was informed of the mortgages given by Martin to the plaintiff, and some testimony tending to show that Martin obtained part of the money derived from the loan made by McClain. It is claimed by McClain that he made the loan to King, whom he did not know, without seeing the cattle, or without examining the records; and he further states that "it is a rare thing to make an examination in Kansas." In addition to the notice disclosed by the records in Lincoln county, it appears that an additional mortgage was given by Martin to the plaintiff after the cattle had been removed to Jewell county, and that mortgage was on file before any of the alleged negotiations had occurred between King and McClain. The conduct of Martin and King casts suspicion on them, and the time and manner in which the cattle were shipped by McLain, as well as the shifting of them from one side of the state line to the other when discovered, should be considered in determining the good faith of their transactions. There was testimony tending to show that the cattle were worth about $18,000 at the time they were taken by McLain, while according to his own testimony the amount of his lien was $10,000. The plaintiff did not even get the benefit of the surplus under the judgment that was given. In our opinion the demurrer to the evidence should have been overruled. If the mortgages given by Martin to the plaintiff can be upheld, then both King and McLain are charged with notice of the liens which they created, and the plaintiff is entitled to recover. To sustain the ruling of the court it is urged that because there was no separation at the time the sale was made to Martin and the mortgage executed by him on November 9, 1885, the mortgage is invalid. It is true that the 250 steers were not

separated from the rest of the herd at that time.   There were 361 in the herd, and Martin purchased 250 of an average of the 361, agreeing to drive the remaining 111 to his place in Lincoln county and keep them until called for.   For the plaintiffs it is contended that by this agreement they held the cattle as tenants-in-common, and the interest of each was fixed in proportion to their respective shares — that is, Martin owned $\frac{250}{361}$ and plaintiff $\frac{111}{361}$ of the herd, and therefore no difficulty could arise in the matter of selection.   If it is granted, however, that the mortgage first given was invalid in law, it would at least constitute a valid equitable lien as between the immediate parties, which could be enforced in accordance with their intention.   Long before the rights of King or McLain, if they had any, intervened, the second sale was made, and Martin became the owner of the entire herd.   The mortgage then made covered the rest of the cattle, and the two together covered the entire herd. After he became the owner of all, and had mortgaged all, the necessity for separation no longer existed.   No rights intervened between the filing of the first mortgage and the execution of the second; and the first, creating at least an equitable lien, was cured of any defects in the description or for lack of separation by the subsequent action of the parties.   The agreement and action of the parties indicate that they intended Martin to become the owner of all the steers, and that he should mortgage all to secure the payment of the purchase-price; and by relation, the second mortgage cured the invalidity of the first.   The mortgage on the 109 head was dated at the same time as the one first given, Martin taking them as of November 9, 1885, upon the same terms and conditions as the first were purchased upon, and relieving the plaintiff from any charge for feeding the 109 head while Martin had them in his possession.   We are only following the purpose and action of the parties when we treat their several actions as a single transaction.   If the company had sold 250 steers out of the herd to Martin on one day, and taken a mortgage

1. Cattle company—chattel mortgage, embracing whole herd—separation, unnecessary.

back on that number, and on the following day had sold the 111 steers and taken a mortgage on them, it would hardly be questioned but that it should be treated as a single transaction, and that, as all were mortgaged, no selection or separation would be necessary. As no rights intervened during the time that elapsed between the two sales, the case supposed does not differ from the one we are considering. Taking these transactions together, as they should be considered, the mortgages include all the steers sold to Martin, and so far as the testimony shows, all that he owned or had had under his control, and hence the description cannot be regarded as insufficient. (*Brown v. Holmes*, 13 Kas. 482; *Shaffer v. Pickrell*, 22 id. 619; *King v. Aultman*, 24 id. 246; *Mills v. Lumber Co.*, 26 id. 574; *Sims v. Mead*, 29 id. 124; *Crisfield v. Neal*, 36 id. 278; *Schmidt v. Bender*, 39 id. 437.) All the steers which Martin had purchased or which he owned having been mortgaged, there could be no difficulty in identifying the property covered by the mortgages.

We may look beyond the description in the instruments for purposes of identification. In general, a description which will enable third persons, aided by such inquiries as the mortgage itself suggests, to identify the property, is sufficient. If the defendant had examined the records of Lincoln county, as it was his duty to do, he would have found the two mortgages dated November 9, 1885, in which the cattle were described by their ages and the marks and brands which they bore, and wherein it is stated that they are the cattle purchased from the plaintiff. If he had pursued the inquiry suggested by the instrument, he would have discovered that Martin had purchased the entire herd of cattle, and had mortgaged them all to the company to secure the payment of the purchase-price; and that all the cattle which Martin had purchased or held in his possession were those particularly described by marks and brands in the mortgages which he had given. He could not possibly have been deceived in respect to the property intended to be mortgaged, nor could he be prejudiced by the failure to separate the cattle when the first

purchase was made. If he had examined the records of Jewell county, where the cattle were held at the time the mortgage to him was executed, and where King, who claimed to be the owner, resided, he would have learned the history of the transactions between the cattle company and Martin; but instead of examining the records of either Lincoln or Jewell counties, as ordinary prudence even would dictate, he claims to have invested $10,000 in a roving herd of cattle that he had never seen, the owner of which he does not know, and without examining the records to ascertain whether this stranger had a title to the cattle, or whether there were any existing liens upon them. The contention of the defendant that the lack of separation when the first. purchase was made invalidated the mortgages, if good, goes too far for his purpose, and virtually denies his own claim of title. If that fact rendered the mortgage void, it would for the same reason invalidate the sale to Martin; and as a person cannot sell or mortgage property which he does not own, neither Martin nor King could convey any interest in the cattle to the defendant. But as we have seen, the purchase of all the cattle rendered the separation unnecessary, and the mortgaging of all removed any doubt as to what property was intended to be covered by the mortgages. If the defendant had taken the description contained in the mortgages and gone to Martin for explanation, and to the place where the cattle were kept, and there examined them to see if they bore the marks and brands described in the mortgages, and pursued the inquiries which the mortgages suggested, he must have been satisfied that the Inter-State Galloway Cattle Company held an existing lien upon the steers offered to him as security for his loan, and that neither King nor Martin had any right to mortgage, sell, or otherwise dispose of them. If the plaintiff showed upon trial that it owned all or any of the cattle, or had any interest in them or in the surplus over and beyond any claim of the defendant, then the judgment is erroneous. Before the court can take a case from the jury upon a demurrer to the evidence, it "must be able to say that, admitting every fact

that is proved which is favorable to the plaintiff, and admitting every fact that the jury might fairly and legally infer from the evidence favorable to the plaintiff, still the plaintiff has utterly failed to make out some one or more of the material facts of his case." (*Brown v. Railroad Co.*, 31 Kas. 1.) The evidence offered clearly tended to establish the issue presented by the plaintiff, and should have been submitted to the jury. The judgment of the district court will therefore be reversed, and the cause remanded for a new trial.

2. Evidence— jury.

All the Justices concurring.